IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**PRESTRESS SERVICES INDUSTRIES OF TN, LLC**                  **PLAINTIFF**

V.                                                 **CIVIL ACTION NO. 3:15-CV-080-MPM-RDP**

**W. G. YATES & SONS CONSTRUCTION
COMPANY; OLE MISS ATHLETICS FOUNDATION;
AECOM DESIGN, A PROFESSIONAL CORPORATION;
AND HOCH ASSOCIATES P.C.**                                     **DEFENDANTS**

**HOCH ASSOCIATES P.C.**                       **THIRD PARTY PLAINTIFF**

V.

**NANGIA ENGINEERING OF TEXAS, LTD.**      **THIRD PARTY DEFENDANT**

## ORDER

This court presently has before it three motions for partial summary judgment filed in the above-entitled action. Having considered the memoranda and submissions of the parties, it is now prepared to rule.

This action arises out of the construction of the Parking Garage adjacent to the Pavilion on the Ole Miss Campus, a project which saw numerous delays and cost overruns which spawned the instant litigation. The factual and procedural history of this case is, unfortunately, quite complex, and this court will not attempt to recount in full the many failures, by many parties, which are alleged to have contributed to the project's delays. Indeed, many of these alleged failures are no longer directly relevant to this case, since several settlement agreements

1

have been reached which significantly limit the scope of this action.

Broadly, however, this court notes that in 2014, the Ole Miss Athletic Foundation ("the Foundation") entered into agreements with Prestress Services Industries of TN, LLC ("PSI") for the purchase of precast components for the Garage. PSI, in turn, contracted with Hoch Associates ("Hoch") to design these components. Hoch, a Texas engineering firm, found it necessary to engage the services of Nangia Engineering of Texas, Ltd. ("Nangia") since the latter firm had on staff the required engineer licensed to practice in Mississippi. In his deposition, however, Robert Nangia testified that he made no actual marks on Hoch's drawings sent to him to review, and he appeared to describe his role as simply rubber-stamping the work done by Hoch. The Foundation entered into a separate contract with W. G. Yates & Sons Construction Company to construct the Garage, and AECOM Design ("AECOM") served as the architect of record on the project.

PSI was the original plaintiff in this case, and, in its complaint, it assigned a considerable amount of blame to the architect AECOM, which has since settled the claims against it. Specifically, PSI maintained that AECOM's design for the garage made it exceedingly difficult to build it with the seven-foot clearance between floors which is required by applicable building standards. As discussed below, now that AECOM and PSI have each settled, Yates, as the assignee of PSI's claims, seeks to hold Hoch (and by extension Nangia) liable for their part in what the parties refer to as the "minimum clearance design bust."[1] Consideration of the minimum clearance issue is complicated, however, by the fact that it was far from the only

---

[1] In addition, Yates continues to assert the claims which it made against Hoch in its cross-claim.

difficulty experienced by the project. To the contrary, there is quite substantial evidence that Yates and Hoch each contributed to the delays suffered by the project with their own errors, discussed below, which are unrelated to the minimum clearance issue.

In light of the above facts, it is unsurprising that sorting out the relative fault and liability of the large number of contractors involved in the project has proven quite difficult. Nevertheless, several settlements and assignments have been entered into among the parties, and they have served to re-arrange the order of battle in this lawsuit to a very significant degree. For example, it appears that Yates, formerly a defendant, now essentially has the status of a plaintiff asserting claims against Hoch, which has itself asserted third party claims against Nangia. For the purposes of this order, however, Hoch and Nangia assert common defenses to the claims asserted by Yates, and they have joined each others' motions. Thus, for the sake of simplicity, this order will sometimes refer to Yates as "plaintiff" and Hoch and Nangia as "defendants," even though Nangia is, once again, more accurately regarded as a third party defendant.

In light of the aforementioned settlements, the remaining claims asserted by Yates are twofold. The first of these claims is partly conceded, namely that Hoch failed to design certain precast concrete parts in accordance with relevant seismic standards. Contemporaneous emails from Hoch conceded that it made errors in this regard, and, as discussed below, it now appears to limit its defense on this issue to that of causation, rather than breach of duty. More specifically, Hoch (and Nangia) each contend that, whatever acts of negligence they may have committed in failing to account for seismic standards, these failures did not cause the delays suffered by the project. That is, defendants argue that the project would have been delayed an even greater

period of time by Yates' own errors in building (and, at times, tearing down and re-building) certain portions of the garage, regardless of any seismic design errors. And, indeed, the record does contain findings from independent engineers hired by the Foundation suggesting that Yates may have made errors in this regard.

Sorting out the "concurrent delay" causation issues arising from potential acts of professional negligence by both of the remaining sides to this litigation seems likely to be a tall order at trial. The consideration of these issues will likely be made even more complex by the existence of Yates' second claim, which involves the aforementioned minimum clearance design issue. While AECOM paid a rather large sum to settle the claims asserted against it on this issue, Yates maintains that Hoch (and by extension Nangia) must still account for their portion of the blame in this context. In asserting liability in this regard, the complaint clearly alleges that Hoch failed to warn of AECOM's design errors, and, as discussed below, Hoch presently seeks dismissal of that failure to warn claim. In its summary judgment briefing, however, Yates insists that the complaint asserts not only a failure to warn claim against Hoch, but also a design defect claim as well. Hoch disputes that the complaint asserts any such design defect claim and it argues that, even if it does, Yates failed to adequately support it with expert testimony.

With the foregoing in mind, this court now turns to the three motions for partial summary judgment presently before it, two of which are mentioned above. This court first addresses Nangia's summary judgment motion (joined by Hoch) on the concurrent delay issue. As noted previously, Nangia and Hoch each contend that Yates committed its own errors in building and rebuilding the garage and that, in light of the serious delays caused by those errors, the overall project suffered no additional delays resulting from the corrections required to the seismic work

4

performed by Hoch and Nangia.

>Specifically, defendants argue that:
>
>[I]n seeking delay damages from Nangia, Yates wholly disregards its own
>concurrent and unrelated delay which exceeded the completion date for the
>seismic issue by two months. Yates fails to mention in that delay claim that they
>had other remediation obligations to the Owner, Ole Miss Athletics Foundation
>("Ole Miss"), in repairing the P4 level topping slab that took multiple pours and
>repairs to complete. Yates' P4 remediation was in fact not completed and
>accepted until June 10, 2015. In contrast, the seismic remediation was completed
>on March 26, 2015, and accepted by Hoch on April 9, 2015.
>The P4 topping slab remediation was required, under the contract documents, to
>be completed before substantial completion would be declared. As the facts will
>show, substantial completion was not declared until June 10, 2015 after Yates
>completed work on the P4 topping slab. Thus, as a matter of contract
>interpretation and Mississippi law, Yates cannot recover delay damages against
>Hoch, as its own P4 remediation caused a delay which exceeded the completion
>date for the seismic remediation by several months. Thus, the contracts preclude
>Yates' recovery against Hoch and/or Nangia for seismic remediation delay as a
>matter of law.

[Nangia and Hoch brief at 2]. This strikes this court as being a rather classic jury issue, and, in order to prevail on this issue as a matter of law, defendants would presumably be required to demonstrate that the "critical path" of the project was not delayed to even a small degree by their own errors on the seismic issue. This court finds that defendants' evidence falls well short of establishing this, and barring such, summary judgment is inappropriate.

Having said that, this court does note that defendants appear to have evidence which might, at the very least, seriously limit their eventual liability in this context. For example, defendants point to a February 2015 change order entered into between the Foundation and Yates which re-defined the date of substantial completion to include a requirement that any "punchlist work" not exceed $50,000 in estimated cost. Defendants further argue that "Yates, through Chet Nadolski, indicated that the P4 topping slab remediation exceeded $50,000 in repair" and that, as

5

such, "Yates could not possibly be at substantial completion, under the written language of these construction agreements, until June 10, 2015, when Yates was certified as having completed the P4 remediation." [Brief at 11].

In the court's view, defendants' arguments on this issue appear to be at least potentially strong ones, but, at the end of the day, they are arguments which are properly addressed to a jury. This court is certainly not prepared to state, based on the record and summary judgment evidence before it, that any errors made by defendants in complying with seismic standards had no effect whatsoever in producing the overall project delays. Indeed, this court notes that Yates' contention is that it was itself forced to perform a great deal of additional work on the precast concrete materials to make them compliant with seismic standards, and a jury might well conclude that the time it spent in doing so contributed to its failure to complete the remediation work earlier than it did.

In so stating, this court notes that Yates counters with robust arguments of its own on the concurrent delay issue. For example, Yates characterizes the "enhancements" which it made in 2015 to its earlier repairs on the P4 slab as "extremely minor" ones. Yates also takes issue with defendants' timeline, arguing that:

> Nangia asserts that "Yates' remedial construction on P4 topping slab continues past April 9, 2015, not concluding until June 10, 2015." This implies that the P4 slab remediation was a continuous process. As stated there was no substantive work on the P4 slab between December 31, 2014 and June 1, 2015. The critical path shifted to the seismic code retrofit on January 21, 2015. There was no time that the seismic code retrofit and the P4 slab remediation were concurrent activities on the critical path.

[Brief at 5]. It is thus apparent that the parties disagree regarding fundamental factual issues relevant to the concurrent delay issue, and it seems clear that a jury will be required to resolve

6

these issues. Indeed, this court regards the concurrent delay issue as not only involving triable jury issues, but some of the more complex jury issues which it can recall.[2] This court therefore has little difficulty in concluding that this issue is not a proper one for resolution on summary judgment, and defendants' motion will therefore be denied.

This court now turns to Hoch's motion (joined by Nangia) for partial summary judgment on the minimum clearance design issue. As noted previously, Yates' claims in this context include both a failure to warn claim which Hoch concedes was properly assserted in the complaint and a design defect claim which, it insists, was not. In arguing that triable jury issues exist regarding its failure to warn claim against Hoch, Yates argues that:

> In addition, Yates did also allege that Hoch failed to warn of its design error. In a construction context, a construction professional has a duty to perform in accordance with the project plans and specifications. However, under Mississippi law, if the plans and specifications create "a construction problem of which the builder/contractor, the man with expertise should be well aware," then the contractor has a duty to warn. *George B. Gilmore Company v. Garrett*, 582 So. 2d 387, 396 (Miss. 1991). Thus, "[t]he jury was warranted in finding [the contractor] negligent in failing to warn the [owner] of a possible problem [with Yazoo Clay], and in undertaking to construct the house without making a soil test, and such failures alone or in combination proximately caused the damage to the house." *Id.* at 393. While *Garrett* specifically dealt with the contractor's common law duty to warn of a possible problem, Yates believes that this reasoning as regards a duty to warn should be applied to Hoch with respect to its failure to produce a workable design both as an implied contractual obligation and as a duty under common law.

[Brief at 8].

Thus, Yates relies upon the Mississippi Supreme Court's decision in *Garrett* in support of

---

[2]It appears to this court that the fact issues in this case are sufficiently complex that the parties might legitimately decide that a mediator experienced in resolving construction disputes would likely produce a more reliable result than a jury lacking in experience in these matters. This is a matter for the parties to decide, but this court has little difficulty in concluding that this case is not an appropriate one for resolution at the summary judgment stage of proceedings.

its argument that Hoch had a common law duty to warn of defects in the minimum clearance design, even if it did not commit those defects itself. Importantly, Hoch fails to even address the *Garrett* decision in its twenty page reply brief, which is almost entirely devoted to Hoch's design defect claim. In the court's view, *Garrett* does at least arguably appear to support Yates' argument in this context, since the contractor in that case was certainly not at fault for the presence of Yazoo Clay deposits below the house. Nevertheless, the Mississippi Supreme Court concluded that it faced potential liability for failure to warn, since it failed to take steps to test the soil to ascertain whether there might be a problem.

In its summary judgment brief, Hoch argues that the existence of a contractor's duty to warn was something Yates was required to prove with expert testimony and that it has failed to present such testimony in this case. In relying upon *Garrett*, however, Yates' contention is that the Mississippi Supreme Court has itself established the existence of such a duty as a matter of Mississippi law and that the question is simply whether Hoch breached that duty in this case. Once again, Hoch has not attempted to rebut this argument. In the court's view, there are strong public policy considerations in favor of ensuring that buildings are constructed correctly, and it can discern no good reason why a contractor should not have a legal incentive to speak up when it knows, or should know, of significant defects which threaten the project. This is true even if the mistake in question originated with someone else.

At the same time, this court acknowledges that Hoch's initial brief on the failure to warn issue pointed out arguable weaknesses in Yates' proof regarding whether Hoch breached its duty to warn of defects in AECOM's design. While this court does not regard Hoch's arguments in this context as sufficiently compelling to grant summary judgment on the failure to warn issue, it

8

will carefully consider the sufficiency of proof presented at trial in deciding whether a directed verdict should be granted on this issue. In particular, this court will be interested to see at trial what proof Yates has that a reasonably competent engineer in Hoch's position should have been aware of potential problems involving the minimum clearance design issue. This court will also be interested in how obvious any defects in AECOM's design might have been, partly to assist in determining whether any deficiencies in Yates' expert testimony on this issue should be excused. *See, e.g. Hubbard v. Wansley*, 954 So. 2d 951, 960-961 (Miss. 2007)("where a layman [juror] can observe and understand the negligence as a matter of common sense and practical experience expert testimony is not necessary.") Following the presentation of the evidence at trial, this court will make a definitive ruling regarding whether Hoch faces potential liability in this context. At this juncture, however, this court concludes that Hoch's briefing fails to establish that it is entitled to summary judgment on the failure to warn issue.

This court now turns to the design defect portion of Hoch's briefing on the minimum clearance issue, which the court finds to be quite persuasive. That is, this court agrees with Hoch that the complaint in this case failed to adequately allege that Hoch committed acts of negligent design with regard to the minimum clearance issue, and that, even if it had, Yates has failed to adequately support such a claim with expert testimony. In contending that the complaint did, in fact, assert a design defect claim against Hoch relating to the minimum clearance issue, Yates argues that:

> Hoch's Motion for Partial Summary Judgment is based upon a false premise. Hoch assumes that the only allegation made by Yates against Hoch is a failure of Hoch's duty to warn, for which Yates, Hoch alleges, has not offered any expert testimony. In reaching this conclusion, Hoch ignores the following paragraphs of Yates' Cross Claim (Doc. #42):

9

> 264. Unfortunately, this realization [of noncompliance with the 7 foot minimum clearance code requirement] did not come until substantial work, particularly at Parking Level 4 (P4), had already been put in place.
> 265. In order to overcome this massive design error, Yates was forced to redo topping slabs by installing a thinner slab which practically had to be custom made in order to maintain various required dimensions for slope, concrete cover, and placement, sizing, and spacing of rebar with zero construction tolerance.
> 266. Additionally, as a result of no tolerances allowed for constructability, Yates had to add precast caps at Levels P3, P4, and P5 and increase the height at the perimeter spandrels and railings in order to maintain code requirements for minimum handrail heights.
> 267. The minimum clearance rework required chipping and removal of the originally installed topping slab that penetrated the pre-stressed concrete members in multiple locations in the P4 level.
> 268. Upon completion of the removal of the P4 topping slab and in preparation for replacing the topping slab, Yates requested Hoch, the design subcontractor for PSI-TN, to inspect the conditions and to recommend a rework protocol including patching necessitated by the rework.
> 373. For its Amended Cross Claim against Hoch, pursuant to F.R.C.P. 13(g) and F.R.C.P. 5(a)(1)(B), Yates restates its previous allegations as if fully rewritten herein, and Yates further alleges as follows.
> 374. Hoch had the obligation to design precast materials, the topping slab, and related concrete elements in accordance with the Project plans prepared by AECOM.
>
> Yates' claims against Hoch embrace Hoch's failure to comply with the contract documents, its violation of code, and its "massive design error".

[Brief at 3].

This court has carefully reviewed the above-cited portions of the complaint, but it sees nothing which alleges that Hoch committed design errors in relation to the minimum clearance issue. Yates argues that the complaint makes reference to Hoch's "massive design error," but paragraph 265 actually refers to "this massive design error," without specifying whose error that

10

was. The complaint does not allege that Hoch committed that error, and, as defendant argues in its brief, the pleading as a whole clearly alleges that it was AECOM which did so.

The above conclusion is supported by portions of the complaint which Yates failed to cite in its brief. As quoted above, Yates' quotation of the complaint stops at paragraph 374 of its amended cross claim, but the very next paragraphs in the document allege as follows:

> 375. Because of the constraints imposed by AECOM's design of a ten foot (10'0") floor-to-floor height, there were no production and field tolerances left, as beams, spandrels, railings, topping slab thickness, topping slab rebar and reinforcing mesh, minimum concrete coverage of reinforcing, and topping slab, and still satisfy the seven foot (7'0") minimum clearance height requirement of the International Building Code (IBC-2017) for P2 through P4 levels of the Parking Garage.
> 376. While AECOM is primarily responsible for the Minimum Design Clearance Bust (Paras. 256-274), Hoch was negligent in not warning of this clearance problem prior to shipment and installation of precast and concrete elements which, Hoch knew or should have known, could not be constructed with normal and allowance tolerances and still meet IBC clear height requirements.
> 377. To the extent Yates does not recover against the Foundation or against AECOM for the Minimum Clearance Design Bust, Hoch is liable to Yates.

In the court's view, the above language makes clear that it was AECOM, and not Hoch, which allegedly committed a "massive design error" on the minimum clearance issue, and paragraph 376 merely asserts that Hoch is liable for "failure to warn" of AECOM's design errors, not that it made design errors of its own in this context.

In its brief, Yates also cites a portion of PSI's complaint detailing its claims against Hoch, which have been assigned to Yates. However, that portion of the complaint merely alleges that:

> 125. Hoch owed PSI a duty of care with respect to Hoch's engineering work for the Project.
> 126. Hoch breached that duty by, among other things, negligently performing engineering and design work such that, among other things, the design for the Project did not comply with the applicable seismic code.
> 127. As a direct and proximate result of Hoch's negligent breaches of the duty of

11

> care it owed to PSI, PSI has incurred damages and demands judgment in an
> amount in excess of $75,000, plus pre- and post-judgment interest, costs,
> reasonable attorney's fees, and any other relief this Court deems just.

It is thus plain that paragraph 126 makes reference to design errors made by Hoch with regard to the *seismic code* issue, and, as noted previously, defendant does not appear to dispute that it made errors in that regard (though it does deny that these errors delayed the project).

The present motion for summary judgment is concerned with Hoch's potential liability for the minimum clearance design issue, not with the seismic code issue. While the above-quoted language of the complaint does include rather standard language asserting that Hoch's design errors included the seismic issue "among other things," this vague language is plainly insufficient to allow Yates to inject a completely new design defect claim which was otherwise not asserted in the complaint. In so stating, this court notes that a design defect claim of this nature is inevitably a highly complex matter, which would almost certainly have required Hoch to consult with expert witnesses and conduct extensive discovery. It would go against all considerations of fairness and the Federal Rules of Civil Procedure to allow Hoch to assert a new claim of this magnitude after the close of discovery and after the deadline for designating expert witnesses has passed. Allowing such a design defect claim would be even more unfair in this case, considering that AECOM has already paid a very large amount to settle a claim based on a complaint which alleged that it, and not Hoch, had committed a "massive design error." It seems likely to this court that AECOM might not have been willing to pay as much to settle this claim if the complaint alleged that Hoch shared in the liability for minimum clearance design errors.

In light of the foregoing, this court concludes that the complaint fails to properly allege a design defect claim against Hoch relating to the minimum clearance issue, and its motion for

summary judgment is due to be granted on this basis alone. This court additionally notes, however, that Hoch's briefing discusses numerous weaknesses in Yates' expert testimony on this issue, and this court agrees that, even if the complaint could somehow be construed as asserting a design defect claim on the minimum clearance issue, that claim would still fail for lack of expert testimony. This court regards the pleading issue as being sufficiently clear that it will not further discuss the expert testimony issue, but it agrees with and incorporates Hoch's discussion of this issue. It is therefore ordered that, with regard to the minimum clearance claim, Hoch's motion for summary judgment is granted with regard to the design defect issue and denied as to the failure to warn issue.

This court now turns to the third motion for partial summary judgment, which is asserted on the basis of the economic loss doctrine. In the court's view, this motion involves a rather interesting issue of tort law, which, judging by the parties' briefing, does not appear to have been directly addressed by either the Fifth Circuit or the Mississippi Supreme Court. Relying upon authority arising in factually different contexts, Hoch describes the economic loss doctrine as follows:

> The precast components are products or goods. The Purchase Order between Ole Miss and Prestress defines the materials referred to in the Purchase Order as "Goods." *(See Ex. "1," Purchase Order, P. 2)*. The Contract between Prestress and Hoch defines the scope of services as "Structural Design for precast, prestressed concrete products . . . ." *(See Ex. "2," Hoch Contract, P. 6)*. Yates alleges the precast concrete components were defective because they did not meet the seismic code. The economic loss doctrine restricts recovery for a defective product to "damages for physical harm, thereby excluding recovery for purely economic damages . . . ." Georgia Flight of Delaware, Inc. v. Gulfport Aviation Partners, LLC, 2016 WL 3034331, *2 (S.D. Miss. May 27, 2016).

[Hoch's brief at 5]. Thus, Hoch argues that even assuming that it acted negligently in failing to

13

engineer certain precast concrete materials in accordance with the seismic code, any recovery against it should be barred by the economic loss doctrine.

In response, Yates argues that the facts of this case support a conclusion that Hoch's negligence was not in the manner in which it manufactured the precast concrete products, but rather in the professional engineering services which it provided:

> Despite the unambiguous terms of the Prestress-Hoch Agreement and contrary to Hoch's own admissions that it performed structural engineering services, Hoch asserts that Yates' "claims are based on product failures" barred by the economic loss doctrine. In the first place, especially as to the seismic code violation, there were no defective precast products. Instead, all precast remained as originally erected. In order to bring its design into compliance with the seismic code, Hoch had to design additional cabling, curbs, and plates to go on top of the existing precast structures. None of these additional strengthening elements were part of the original design, and none of them affected the existing precast members. No precast members had to be replaced or repaired to accomplish the seismic code compliance retrofit. (See Affidavit of John Campbell (Campbell Aff."), attached hereto as Exhibit "A" at ¶¶ 7, 9, 10). Thus, there were no precast members which had any defects.

[Yates' brief at 4-5]. Yates further argues that, as set forth in the parties' contracts, PSI was actually the manufacturer of the precast contract products and that Hoch's role was merely to provide engineering services, as to which the economic loss doctrine does not apply. Specifically, Yates argues that:

> As their Agreement confirms, Hoch had nothing to do with the production of precast members. Precast production was done by Prestress. See Campbell Aff., Exhibit "A" hereto at ¶¶ 6-7. Hoch's only obligation was "to provide structural engineering services for the precast concrete products." (Hoch's Motion under I. UNDISPUTED FACTS, page 2, item 2; Doc. #181, Page ID #2547). The economic loss doctrine does not apply to performance of design services. *Lyndon Property Insurance Co. v. Duke Levy and Associates, LLC*, 475 F. 3d 268, 274 (5th Cir. 2007) (economic loss doctrine does not apply to negligent performance of engineering services); *Mississippi Phosphates Corp. v. Furnace and Tube Service, Inc.*, 2008 WL 313770 (S.D. Miss. 2008) (economic loss doctrine does not apply in a tort action over delays in services to retube a waste heat boiler).

14

[Yates' brief at 5].

This court agrees that the proof at trial regarding the exact nature of Hoch's role in this case is, at least potentially, relevant to whether or not it may validly raise the economic loss doctrine as a defense. This court therefore concludes that this is an issue that would be better raised at the directed verdict stage, after it has viewed the evidence and has a fuller picture regarding the exact nature of Hoch's role in this case. This court does note its concerns, however, that, if the economic loss doctrine were held applicable here, this would leave aggrieved parties without an effective remedy for any foreseeable losses from Hoch's admitted failure to design the precast concrete materials in accordance with seismic standards.

As noted above, Hoch argues that the economic loss doctrine limits Yates' recovery to "damages for physical harm," and it seems undisputed that there was no "physical harm" resulting from Hoch's failure to design the precast materials in accordance with seismic standards. At the same time, the parties were all aware that they were working on a construction project on a rather tight schedule to build a parking garage in North Mississippi, which is commonly known (at least among Mississippians) to be within the New Madrid fault's earthquake zone. It appears to this court that defendants' entire role in this case was to provide engineering services with these limitations in mind, and if their position were accepted as correct, then this would seemingly mean that Yates would be entitled to no damages for entirely foreseeable economic losses which it suffered in this context.

Under defendants' theory, plaintiff would have no apparent legal recourse for their failure to perform their duties in accordance with professional standards, unless and until "physical harm" resulted from that failure. As best this court can tell, "physical harm" resulting from

defendants' failure to comply with relevant seismic standards would only occur in the event that an earthquake actually damaged the garage, resulting in physical damage and/or loss of life. This would seemingly give a contractor in Yates' position, upon learning of the defect in defendants' work, a financial incentive to simply say nothing, in the hopes that no earthquake would actually occur. Otherwise, defendants' argument would leave plaintiff holding the financial bag for their failure to do their jobs correctly, and this court finds this situation is one which would likely lead to rather perverse financial incentives.

This court also has concerns that applying the economic loss doctrine in this case would run afoul of the policy considerations underlying the economic loss doctrine. In the typical products liability case, a court is dealing with a manufacturer which designed a product for mass production and did not specifically tailor it for the needs of a given project. In a more typical products liability context, the economic loss doctrine would appear to serve a quite valid purpose, by providing some limitation upon the damages which a manufacturer might face. Barring such a limitation, for example, a manufacturer of a car which crashed due to a design defect might conceivably face liability for business losses suffered by individuals who were delayed in traffic following the accident. These concerns are inapplicable in this case, however, since (this court presumes) Hoch and Nangia knew exactly what project they were working on, and it seems clear that it was their job to provide competent professional services in light of that knowledge.

This court might ordinarily be inclined to certify this difficult issue for interlocutory review to the Fifth Circuit, but it concludes that the public policy considerations in this particular case are so strongly against Hoch's position that it seems quite unlikely that its arguments will

eventually carry the day. In so concluding, this court notes once again that this case involves not just any duty of care, but a duty to design a public building in such a manner that it might withstand an earthquake. That being the case, if there is any context in which it seems unlikely that an appellate court would seek to reduce the incentives for professionals to do their job correctly, then this is it.

While this court declines to infer a broad "professional services" exception to the economic loss doctrine, it does note that Hoch's position would appear to provide it with a far greater degree of immunity from the consequences of its professional negligence than is generally the case, in other areas of the law. Generally speaking, when professionals are negligent in performing their duties, they face liability for the foreseeable consequences of their actions. In the court's view, the facts of this case are materially indistinguishable from one involving an attorney who is hired to prepare a will for clients known to live in a particular state. If that attorney fails to draft the will in accordance with the state's laws, then it seems quite likely that he would be subject to liability for any economic harm resulting from his negligence. In such a case, it could certainly be said that the lawyer produced a "product" of sorts, but the essential nature of his action was the providing of professional services. It is unclear to this court why Hoch's negligence in this case should be treated any differently, and, once again, the public safety implications of the project provide all the more reason why it should not be.

It seems clear that the economic loss doctrine is intended to strike a balance between encouraging products manufacturers to design their products with care and imposing essentially unlimited liability when they fail to do so. In this case, however, Hoch appears to seek not a *limitation* of its liability, but rather a *gutting* of that liability. Indeed, it appears to this court that

Hoch is asking for nothing less than to be held financially immune from entirely predictable consequences of its failure to perform core aspects of its role as an engineer on the project. To be clear, this court is dealing with an engineering firm which was called upon to design products for use in a specific project with specific needs and requirements which are crucial to public safety.

It should be emphasized that nowhere in Hoch's briefing does it assert that it did its job correctly in this regard, and its representative has previously admitted that it did not. In its reply brief on the minimum clearance design claim, Hoch writes that "[i]t is undisputed that plans signed and sealed by Nangia did not conform to the seismic code." [Brief at at 18]. In so stating, Hoch fails to mention the fact that it actually *prepared* the plans which, Robert Nangia testified, he merely rubber-stamped to provide the imprimatur of a Mississippi-licensed engineer. In filing the instant motion, Hoch seeks to ensure that "someone else" is left holding the financial bag for its failure to comply with relevant professional standards, but this court is not at all sympathetic to this argument, for reasons which should be obvious.

This court is not an appellate court, and it will not attempt to fashion or define the parameters of any exception to the economic loss doctrine in this case. If this court were to endeavor to do so, however, then it would seriously consider whether the economic harm rule serves any useful purpose in cases involving professional services (such as engineering services) whose core purpose is to produce a product with certain requirements known to the professional. This is particularly true when those requirements are essential for public safety. In such cases, a failure to produce a product which meets those requirements involves a basic failure to do one's job correctly, and it strikes this court that professionals carry liability insurance for situations

such as this. Once again, this court will not definitively rule upon Hoch's motion until the directed verdict stage of trial, but it should be clear from its order today that it is rather strongly disinclined to grant Hoch the relief it seeks on this issue. If Hoch wishes to change this court's mind on this issue, then it should be prepared to address the concerns raised above in any arguments which it presents in seeking directed verdict. With this caveat, Hoch's motion for summary judgment on this issue will be dismissed without prejudice to the arguments set forth therein being raised at a later date.

In light of the foregoing, it is ordered that defendants' motion for summary judgment on the concurrent delay issue [177-1] is denied, their motion for summary judgment on the minimum clearance issue [173-1] is granted in part and denied in part, and their motion for summary judgment [181-1] based on the economic loss doctrine is dismissed without prejudice to the arguments asserted therein being raised at the directed verdict stage of trial.

SO ORDERED, this the 16th day of November, 2017.

/s/ Michael P. Mills
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI